Alfred RYDER and Mary Ann
Ryder, Appellants,

v.

HULLINGER TRUCKING COMPANY,
INC., et al., Respondents.

No. WD 39630.

Missouri Court of Appeals,
Western District.

Sept. 13, 1988.

Rehearing Denied Nov. 1, 1988.

Gordon E. Cox, Chillicothe, for appellants.

David B. Sexton, Jane Pansing Brown, Kansas City, for respondents.

Before KENNEDY, C.J., and TURNAGE and BERREY, JJ.

KENNEDY, Chief Judge.

Alfred and Mary Ann Ryder appeal an adverse judgment on their petition to set aside an execution sale of certain of their farm real estate.

The Ryders were debtors on a $23,402 judgment in favor of S & W Farm Supply, Inc., dated April 26, 1984. By the time of the execution sale on June 17, 1985, the judgment, including interest and court costs, amounted to something in the vicinity of $27,000. The Ryders' land was levied upon and advertised for sale by Carl M. Ward, the sheriff of Sullivan County, where the property was located. The land consisted of three tracts totaling approximately 800 acres. Tract 1—the tract at the center of the controversy—consisted of 604 acres. The successful bidder for Tract 1 and for Tract 3 was defendant Hullinger Trucking Company. There were no bids for Tract 2. Hullinger Trucking Company was the purchaser of Tract 1 for a bid of $1,000 and of Tract 3 for a bid of $4,300. Tract 1 was subject to a Federal Land Bank deed of trust for $208,000.

The Ryders, on June 20, 1985, brought the present suit to set aside the sale.

The facts developed by the record are as follows:

The sale commenced at two o'clock p.m. on June 17, 1985. There were perhaps as many as ten people present at the sale,

including the Ryders and Mr. Hullinger, who was representing Hullinger Trucking Company.

Mr. Peace, the attorney for S & W Feed Supply, Inc., the judgment creditor, announced that the terms would be "certified check, cash, or money readily available by calling and verifying it". He also announced that there was a Federal Land Bank encumbrance of $208,000 against the property, and also that there was an accumulation of three years' unpaid taxes amounting to approximately $7,500. Mr. Ryder himself, according to Peace's testimony, "was announcing to the crowd that it couldn't be sold ... because of the Land Bank deed of trust and it was a large amount of money; that it couldn't be sold because MFA had to be paid and because Pocklington Seed had to be paid and because Ryder Farms was owed $860,000 that had to be paid. And that anybody that bought the farm had to pay off those deeds of trust and it simply wasn't worth it." (The proof at trial was that Ryder had had the three deeds of trust—to MFA for $51,200, to Pocklington Seed Company for $23,160, and Ryder Farms, Inc., for $860,000—prepared and recorded during the pendency of the execution sale. At the same time he had filed security agreements to the same creditors covering the crops. These deeds of trust and security agreements covered all three tracts.)

The first bid on Tract 1 was made by Mr. Hullinger in the amount of $5,000. Ryder then bid $90,500. There were no further bids for Tract 1. The sheriff adjourned the sale and he, Mr. Peace and the Ryders repaired to the sheriff's office. Ryder indicated he was going to make the $90,500 check payable to the sheriff, to MFA, to Pocklington Seed Company, and to Ryder Farms, Inc. Mr. Peace said, according to Ryder's testimony: "Oh, you know, Al, you haven't got that much money in the bank." Ryder replied, "Well, I could get it". The upshot of this conference (into which prosecuting attorney Spencer was brought and his advice sought) was that Ryder's proposed check was refused on the ground that the sheriff had to be the only payee. The conference was adjourned and the parties returned to the sale. Tract 1 was again offered for sale by the sheriff.

Hullinger and Ryder were once again the only two bidders. Ryder was the high bidder at $23,500, and Tract 1 was struck off to him. There were no bidders other than Hullinger and Ryder. The sale was adjourned at approximately 2:45 p.m. in order for Mr. and Mrs. Ryder to produce acceptable payment. There was testimony that Sheriff Ward told the Ryders that he would allow 15 minutes for that purpose. The 15–minute time allowance had also been announced at the beginning of the sale, according to Sheriff Ward's testimony.

The Ryders did not return within 15 minutes. After a further wait of from five to seven minutes, the sheriff once again offered Tract 1 for sale. Still present were "essentially the same people that was there at the beginning". Hullinger bid $1,000 for Tract 1; it was struck off to him.

Tract 2 was then offered for sale. There were no bids received.

Sheriff Ward then proceeded to offer Tract 3. As Tract 3 was being offered, the Ryders reappeared. They handed the sheriff a slip of paper and asked him to call that number. (The telephone number was that of the First State Bank of Winchester, Illinois, where the Ryders had an account.) The sheriff told the Ryders that Tract 1 had already been sold. There was testimony that it had been 50 minutes since the Ryders had left the courthouse.

The sale of Tract 3 proceeded. The Ryders either did not bid on Tract 3 or dropped out of the bidding. It was sold to Hullinger Trucking Company for a bid of $4,300.

The Ryders' complaint, for which they claim the sheriff's sale and the deed to Hullinger Trucking Company ought to be set aside, is that the sheriff acted unlawfully in "summarily" rejecting the Ryders' $23,500 bid. We hold that the trial court was correct in denying this contention.

■ A judicial sale may be only for "ready money". That is the language of

the statute, Section 513.235, and the uniform holding of the cases. The sheriff and the creditor's attorney announced at the beginning of the sale "it would be certified check, cash or money readily available by calling and verifying it". The advertisement of the sale had given the sale terms as "cash".

The Ryders contend that they had $18,000 cash on their persons at the time of the bid, and a checking account balance of $10,627.33 in the First State Bank of Winchester, Illinois. Neither of them told the sheriff or the creditor's attorney about this cash. They also introduced as an exhibit at the trial a bank statement showing a $10,627.33 balance with the First State Bank of Winchester, Illinois, as of June 17, 1985. (This was a photocopy of a portion of a statement dated June 20. The statement shows a single line for June 17, with a credit of $10,438.19 and a balance of $10,627.33. All earlier and later activity on the account has been blotted out.) They testified that when they left the courthouse after Tract 1 had been knocked off to them, they went to the office of Mr. Spencer, an attorney in Milan, and attempted to call the Winchester Bank but the line was busy and they were unable to reach the bank. It was the telephone number of the Winchester Bank that was on the slip of paper which they handed to the sheriff on their return to the courthouse 50 minutes later. They also attempted by telephone to negotiate a $10,000 loan from the People's Bank of Mercer.

There was no evidence of the value of the property, nor any claim that the price was unconscionable at which it was sold.

■ After the Ryders had left the courthouse, and after the sheriff had waited 15 minutes, then another five to seven minutes, what was he to do? He could obviously not give the Ryders unlimited time to produce the funds, especially when he had good reason to doubt their good faith and their ability to perform. The other bidders might leave and the sale would dissolve. As Judge Turnage pointed out in *Roark v. Plaza Sav. Ass'n*, 570 S.W.2d 825, 829 (Mo. App.1978):

It is clear the law requires the trustee to exercise a sound discretion and to conduct the sale in the manner which would render the sale most beneficial to the debtor at the best price possible. However, this means the trustee must conduct the sale so that the property is sold rather than merely go through an exercise which would result in accepting any bid made with the result that the successful bidder might later prove to be unable to pay his bid.

Other cases dealing with the choices open to a sheriff or trustee conducting a judicial sale when the high bidder fails to pay his bid include *Stone v. Stone*, 176 S.W.2d 464 (Mo.1944); *Robert R. Wisdom Oil Company, Inc., v. Gatewood*, 682 S.W. 2d 882 (Mo.App.1984); and *Brookshire v. Powell*, 335 S.W.2d 176 (Mo.1960). None of these cases, nor any other cited by any party, condemn the sheriff's conduct of the sale in this case.

We hold that the sheriff was within his discretion in handling the matter as he did. He had reason to be dubious about the Ryders' good faith and about their ability to perform. If they had been able to raise $23,500, the amount of their bid, and had valued the real estate at that amount or more, it seems likely that they would have paid the judgment before it reached the point of an execution sale of the real estate. A seriously purposed bidder would not have waited till the execution sale had been completed and their bid accepted before attempting to make arrangements for the money to pay the amount of their bid. Add to this the Ryders' attempt to chill the sale by placing liens on the property during the pendency of the execution sale, and then announcing to the purchasers at the sale that the liens would have to be paid by the purchaser of the land. The sheriff was right in allowing the Ryders some space of time in which to come forward with acceptable funds to pay their bid, but in the face of his experience with the Ryders he was not unreasonable in not extending the time and postponing the renewed sale of Tract 1 for a longer time—when they might not return at all. Even the 50 minutes, as it

turned out, would not have been sufficient, for the Ryders returned empty-handed.

The trial court was correct in declining to set aside the sale on the ground that the sheriff did not allow more time and opportunity for the Ryders to produce the amount of their bid on Tract 1.

 The Ryders go ahead to say that the sale should be set aside because the sheriff accepted the personal check of Hullinger Trucking, rather than requiring "ready money" as required by Section 513.235. This furnishes no ground for setting aside the sale. The Ryders cite no case for their position. The checks were paid in due course. The judgment debtor suffered no injury, nor did the judgment creditor. The sheriff was perhaps taking a risk in accepting a personal check. Had the check not been paid, the sheriff would perhaps have incurred personal liability to the judgment debtor or the judgment creditor or both. *See* § 57.020, RSMo (Supp.1988); *see generally Miller v. Owsley*, 422 S.W.2d 39, 41 (Mo banc 1967); 50 C.J.S. *Judicial Sales* § 15 (1947). But the risk of nonpayment of the check was the sheriff's to take if he chose to do so. Since the checks were paid in due course, the question passes out of the case.

 The Ryders claim that two of the trial court's findings of fact were unsupported by the admissible evidence. One such fact found was that: "Plaintiffs, Alfred and Mary Ann Ryder, did attempt to chill the foreclosure sale by their actions prior to and at the time of the sale." The other of said facts found was that: "Defendant Hullinger Trucking Company, Inc., successfully bid on the property and the sheriff did verify the check presented by Hullinger Trucking Company, Inc., as ready money,"

Findings of fact were not requested by either party, and the court's findings of fact were voluntary statements by the court. "Defendant may not on appeal assign as error a specific finding of fact or conclusion of law, or the lack thereof, when such findings were not made at the request of one of the parties." *Swetnam v. U.S. By–Products Corporation*, 510 S.W.2d

829, 830 (Mo.App.1974). Both findings, however, were supported by the evidence we have recounted above. We have ex gratia reviewed the evidence for admissibility and find that it was admissible.

Judgment affirmed.

All concur.